DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**E.T.,** the mother,
Appellant,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES** and **GUARDIAN AD LITEM PROGRAM,**
Appellees

No. 4D18-2165

[January 2, 2019]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; Barbara W. Bronis, Judge; L.T. Case No. 15-57-DP.

Antony P. Ryan, Director, and Paul O'Neil, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, West Palm Beach, for appellant.

Andrew Feigenbaum of Children's Legal Services, West Palm Beach, for appellee Department of Children and Families.

Thomasina Moore, Statewide Director of Appeals, and Laura J. Lee, Appellate Counsel, Tallahassee, for appellee Guardian ad Litem Program.

FORST, J.

E.T. ("the mother") appeals a final judgment terminating her parental rights to her child. We affirm as to all issues raised by the mother, writing to discuss two of the issues raised.

## Background

The child was sheltered three times, beginning in May 2015, when she was six months old. The primary reason for the shelter orders was the parents' drug abuse. After the first and second shelter orders, the mother was given a reunification case plan and ultimately achieved reunification. However, following the third shelter order in February 2017, the case plan goal was changed from reunification to adoption.

For the most part, during the shelter periods, the child was placed with the paternal great-grandmother. The great-grandmother, with whom the child has a strong bond, wishes to adopt the child.

In March 2017, the Department of Children and Families ("the Department") petitioned to terminate parental rights ("TPR") on multiple grounds. The mother contested the petition. The father surrendered his rights, and testified for the Department at trial.

The trial lasted six days, and the evidence established the mother's long history of substance abuse. The trial court found that she began using opiates in 2009 when she was eighteen years old. The mother moved to Florida in 2013 to attend a drug rehabilitation program, and met the father while living at a halfway house. Their relationship resulted in the birth of the child in 2014. The trial court's order referenced the father's testimony that, during his relationship with the mother, he "observed [her] abuse heroin, cocaine, crack, Xanax, methamphetamine, benzodiazepine and ecstasy, taken orally and by injection."

The Department received a report in early 2015 that both parents were abusing their then-four-month-old child. It commenced an investigation. Over the course of the next three years, the mother was in and out of drug treatment programs. She completed some of the programs, but her periods of sobriety always ended with relapse. One relapse involved a four-day "meth binge." The mother has overdosed a number of times and been involved in several instances of domestic violence.

Shortly after the third shelter order, the parents entered an addiction treatment center in Palm Beach County. They left the facility early and against medical advice and traveled to the Betty Ford Center in California. On the way to California, they used drugs together. They completed their treatment at Betty Ford in May 2017 and returned to Florida. By that time, the Department had filed its TPR petition and adoption case plan. In June 2017, a little over a month after her discharge from Betty Ford, the mother twice overdosed on drugs, each time requiring hospitalization. She continued to abuse drugs into 2018, and was convicted on the charge of domestic assault against the father based on an incident in February 2018.

On July 6, 2018, the trial court entered its final judgment terminating both parents' rights. The court concluded that termination was warranted on five statutory grounds. The court also found that termination was in the child's manifest best interests and the least restrictive means of protecting the child from serious harm. The mother's appeal followed.

## Analysis

### A. Whether the trial court's active participation during the termination trial violated the mother's due process rights.

The mother's first argument on appeal is that the trial court violated her due process rights by actively participating in the proceeding to the point of exceeding the role of neutral arbiter. We have de novo review of this issue. *A.M. v. Dep't of Children & Families*, 223 So. 3d 312, 315 (Fla. 4th DCA 2017).

A trial judge shall exercise reasonable control over the mode and order of the interrogation of a witness so as to: (1) facilitate the discovery of the truth, and (2) avoid needless consumption of time. § 90.612(1)(a), (b), Fla. Stat. (2018). "When required by the interests of justice, the court may interrogate witnesses, whether called by the court or by a party." § 90.615(2), Fla. Stat. "Such questioning may be appropriate, in the court's discretion, to seek clarification of an issue and in an effort to ascertain the truth." *R.W. v. Dep't of Children & Families*, 189 So. 3d 978, 980 (Fla. 3d DCA 2016). "However, a trial judge must ensure that he or she does not become an active participant or an advocate in the proceedings and should not by words or actions make it 'appear that his [or her] neutrality is departing from the center.'" *Id.* (quoting *Riddle v. State*, 755 So. 2d 771, 773 (Fla. 4th DCA 2000)); *see also Watson v. State*, 190 So. 2d 161, 165 (Fla. 1966) ("Error is committed only when it appears that the judge departs from neutrality or expresses bias or prejudice in his [or her] comments").

Here, while the court actively questioned witnesses during the six-day trial, the questions reflect the court's intent to clarify witness testimony, and to ascertain the truth. For example, during the father's direct testimony, the following exchange took place:

> Q . . . During the time that [the mother] was in Parkwood Behavioral Health and the two [of] you were living together, do you have personal -- any personal knowledge of [the mother] drug screening?
>
> **THE COURT: Can you say when this was?**
>
> [DEPARTMENT'S COUNSEL]: Excuse me? Oh, the dates? . . . From October 6th, 2017 through November, 2017, do you have knowledge of [the mother] drug screening for Parkwood

3

Behavioral Health?

A For Parkwood Behavioral Health she was, as far as I know just requested to take drug tests whenever the Department asked through there. It's not something they normally do, they don't normally give drug tests as part of the –

. . . .

Q Do you have personal knowledge of her drug screening?

A Yes.

**THE COURT: You do. Okay, I thought you were saying they didn't have drug screens.**

THE WITNESS: Well, she had requested it on her own, so to comply with the Department.

**THE COURT: Were you there or this is what she told you?**

THE WITNESS: I was sitting there during a few phone calls.

THE COURT: Okay.

At this time, the mother's counsel objected generally "to any further questioning from [the court] . . . anything that's eliciting testimony that -- from questions that [the Department's counsel] is not asking." The judge responded that she "was actually trying to figure out if [the father] was changing his testimony," because the court "thought the answers were in conflict."

Later, during the direct testimony of the Department's dependency case manager, the following colloquy occurred:

Q This case, was [the mother] obligated to continue with random drug screens after reunification?

A Yes, as part of her case plan.

Q And continue in whatever requested treatment was as a result of the Mental Health Evaluation?

[MOTHER'S COUNSEL]: Objection; leading.

4

[DEPARTMENT'S COUNSEL]: Was [the mother] obligated to continue to comply with her mental health?

[MOTHER'S COUNSEL]: Objection; leading.

**THE COURT: What else was she required to continue to comply with?**

THE WITNESS: The services that were in place at the time of reunification.

**THE COURT: Yes, ma'am.**

THE WITNESS: Substance abuse, random drug screens, mental health.

**THE COURT: So wherever she was in that process at the time of reunification she just had to follow through with it?**

THE WITNESS: Yes.

At this time, the mother's counsel raised the "same objection to [the court] eliciting testimony." The judge responded:

> You know, here's the thing, this, as you know, is very important proceeding, and **I'm just trying to understand the testimony** and you do have the right to object, but **this is not about gotcha tactics** or, you know, technical errors or anything like that, I don't see these kinds of cases as being about that. **I agree there's a line beyond which the Court should not go**, for example, if I'm sitting here and thinking of a question that should have been asked and wasn't asked, I probably wouldn't ask the question, sometimes I do, **but since I'm the finder of fact** and I would add that in trials, every juror gets a notebook and a piece of paper, and they can ask the witness whatever questions they want, so I'm the finder of fact and **I have to be sure that I understand the evidence** and I agree that the attorneys should be held to task, but **when the witness's answer is close enough and it's gonna save time for me to just intervene and ask the question, that's what I do because we're already here on the second day of a one day trial and there's just no other way for me**

5

**to try to manage this process**, so I feel that's where I'm coming from. I've told you before, **I encourage you to make these kinds of objections**, and I -- because, you know, part of your job is to watch what I do, and, you know, I wanna be told, but I **so far don't believe I've crossed the line**. You might be able to convince me otherwise, but so far you haven't, other than just saying, Your Honor, please don't ask the questions.

No further objections were made to the court's questioning of witnesses. Accordingly, the mother failed to preserve any objection she might have unless she can establish fundamental error—which she cannot. *See R.W.*, 189 So. 3d at 979-80 ("At the final hearing, . . . R.W. failed to object to virtually all of the questions [she] now relies upon . . . . [W]e find no fundamental error or deprivation of due process"); *see also Mathew v. State*, 837 So. 2d 1167, 1170 (Fla. 4th DCA 2003) ("[N]ot every act or comment that might be interpreted as demonstrating less than neutrality on the part of the judge will be deemed fundamental error.").

We note that, while the trial court suggested to the Department's counsel that she reword a question asked of a witness—which the mother mischaracterizes as "coaching"[1]—the court provided similar support to the mother and Guardian ad Litem Program. The court also asked questions

---

[1] When the Department's counsel asked a witness "Why are you here today to testify, what is it . . . that you believe you're adding to this case today?" the following discussion took place:

> THE COURT: Hold on, you're getting a little . . . . First of all, were you subpoenaed to be here today? Were you served with a subpoena?
>
> THE WITNESS: No, ma'am.
>
> THE COURT: Okay, you were asked to come and testify and you're doing it voluntarily?
>
> THE WITNESS: Yes, Your Honor.
>
> **THE COURT: Okay. So I think you're gonna have to narrow it to make it a little more specific of a question. Like what do you want the judge to know today as a result of your testimony?**

The Department then rephrased its question as: "What is it that you want the judge to know today as a result of your testimony?

that were favorable to the mother and to which the Department objected.

In short, this was not a criminal trial, but a TPR proceeding in which the best interest of the child was paramount. The transcript reflects that the court appropriately questioned witnesses where necessary during the six-day trial, to manage time, understand the evidence and ascertain the truth. We therefore affirm with respect to this issue. We also find the mother's other due process argument (regarding the father testifying by telephone) to be without merit, and we affirm on that issue without comment.

## B. The legal requirements for termination of the mother's parental rights were satisfied.

The mother argues that termination under section 39.806(1)(e)1., (e)3., and (j), Florida Statutes was not proven by competent, substantial evidence. We have held:

> "While a trial court's decision to terminate parental rights must be based upon clear and convincing evidence, our review is limited to whether competent substantial evidence supports the trial court's judgment." *J.G. v. Dep't of Children & Families*, 22 So. 3d 774, 775 (Fla. 4th DCA 2009). "[S]o long as the trial court's ruling on one of the statutory grounds set forth in section 39.806, Florida Statutes, is supported by the evidence, the court's decision is affirmable." *J.E. v. Dep't of Children & Families*, 126 So. 3d 424, 427-28 (Fla. 4th DCA 2013).

*M.D. v. State, Dep't of Children & Families*, 187 So. 3d 1275, 1277 (Fla. 4th DCA 2016).

The trial court found the Department proved by clear and convincing evidence *five* statutory grounds for a TPR: section 39.806(1)(c), (e)1., (e)3., (j), and (*l*). The mother challenges the court's findings only as to subsections (1)(e)1., (e)3., and (j). She failed to brief and argue any legal issue related to subsections (1)(c) and (*l*), although the trial court determined that the Department proved, by clear and convincing evidence, that the parental rights of the mother should be terminated based on (1)(c) (parent engaged in conduct toward the child "that demonstrates that the continuing involvement of the parent or parents threatens the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services") and (*l*) ("On three or more occasions the child or another child of the parent or parents has been

placed in out-of-home care pursuant to this chapter . . . and the conditions that led to the child's out-of-home placement were caused by the parent or parents").

Because the mother fails to challenge the other two grounds for termination, she has waived any argument with respect to these holdings of the trial court. *See In re J.W.,* 210 So. 3d 147, 152 (Fla. 2d DCA 2016) (holding that, because the mother was put on notice by the answer briefs that she had waived the issue of termination based on section 39.806(1)(d)(3), because of her failure to argue the point in her initial brief and failure to move for leave to file an amended initial brief to address the issue, "[the mother] has waived the point about the sufficiency of the evidence to support termination");[2] *see also Coolen v. State,* 696 So. 2d 738, 742 n.2 (Fla. 1997) (stating that a failure to fully brief and argue points on appeal "constitutes a waiver of these claims"). The mother also failed to challenge the trial court's determination that granting the TPR was in the child's manifest best interests and the least restrictive means of protecting the child from serious harm. Accordingly, we need not reach the merits of the second issue.

**Conclusion**

The child has spent most of her four years living with the paternal great-grandmother. The mother has spent most of this period either using illegal drugs or in rehab. The trial court did not deny the mother due process and instead patiently and exhaustively heard and addressed the testimony and arguments of both parties before concluding, correctly, that it is in the "manifest best interests" of the child that the parental rights of both the mother and the father be terminated, and "that termination is the best restrictive means of protecting the child from serious harm." We therefore affirm.

*Affirmed.*

GERBER, C.J., and KLINGENSMITH, J., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

---

[2] As in *In re J.W.,* the mother here did not seek leave to file an amended initial brief after the Department argued waiver in its answer brief. Nor did she file a reply brief. *See In re J.W.,* 210 So. 3d at 152 n.8.